UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | NO. 07-CR-136-ML |
| | ) | |
| CHARLIE VU | ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF**
**HIS MOTION FOR SUPPRESSION OF EVIDENCE**

Charlie Vu ("the Defendant"), in the above-numbered Indictment and through Counsel, submits the following Memorandum in Support of his Motion to Suppress Evidence.

**Facts.**[1]

On May 11, 2007, the Defendant was operating his vehicle – a 1995 Pathfinder – in the State of Rhode Island. One or more Rhode Island State Police Troopers pulled him over to the side of the roadway. The Defendant produced a New Jersey driver's license, and informed the Troopers that he had visited his son at the University of Rhode Island and was on his way back to New Jersey.[2]

The Troopers[3] saw a blue duffel bag in the rear of the Defendant's car and – upon their claim – the Defendant 'consented' to let them search through it. *The Defendant categorically denies consenting to any search, including that of the bag and its content.* Inside the bag, the Officers discovered a large amount of United States currency -- $220,270 to be precise – contained in a number of 'vacuum sealed bags.' According to

1 The recitation of facts has been drawn from such discovery as has been made available thus far -- to the Defendant. Defendant's Counsel believes, however, that not all the facts are known to him. Therefore, he reserves the right to supplement his case with further pleadings and discovery requests, including a supplement to this Motion and Memorandum.

2 There was no evidence that the Defendant's license was anything but valid, nor that his story was anything but true.

3 It is not known how many Troopers were present on the scene, or whether they were accompanied by members of other law enforcement agencies.

the Police, the Defendant disclaimed any knowledge of the money or, for that matter, how it came to have been placed in his vehicle. Despite the confrontation and interrogation, the Defendant was not afforded the Miranda[4] *caveats*.

With no undue delay, the Defendant was transported to one of the Rhode Island State Police Barracks. Curiously enough, Immigrations and Customs Enforcement ("ICE") Agent William Walker was present at the Barracks, along with the Resident Agent in charge, one David Ricchio. The two ICE Agents continued the interrogation of the Defendant. The Government will make the somewhat dubious – and self-serving -- claim that the Defendant was informed that he was not under arrest, and that he was free to go at any time.

Subsequently, the Defendant made certain statements to law enforcement Officers which were incriminatory in nature and which, should this matter proceed to trial, the Government can be expected to use against him.

**Argument.**

**1. The Stop of the Defendant's Vehicle was without Probable Cause.**

It is black-letter law that the stop of an automobile and detention of its occupant or occupants implicates the protections of the Fourth Amendment. Delaware v. Prouse, 440 U.S. 648, 653, 99 S.Ct. 1391 (1979). "A *seizure* occurs under the Fourth Amendment whenever a motor vehicle is stopped by an agent of government." Illinois v. Caballes, 543 U.S. 405, 430, 125 S.Ct. 834 (2005), emphasis added. See also Michigan Department of State Police v. Sitz, 496 U.S. 444, 450, 110 S. Ct. 2481 (1990); Commonwealth v. Anderson, 406 Mass. 343, 345, 547 N.E.2d 1134 (1989). "[I]n Fourth Amendment terms a traffic stop entails a seizure of the driver 'even though the

4 Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1966).

purpose of the stop is limited and the resulting detention quite brief.' " Brendlin v. California, --- U.S. ---, 127 S.Ct. 2400, 2406 (2007), quoting Prouse, *supra*, at 440 U.S. 653, and adverting to Whren v. United States, 517 U.S. 806, 809-810, 116 S. C t. 1769 (1996). Further, "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of '*persons'* " under the Fourth Amendment. *Whren*, at 517 U.S. 809-810, emphasis added.

In the present case, there is no doubt whatever that a seizure – both of the Defendant's vehicle and the Defendant himself – was conducted by the Troopers. The discovery made available to the Defendant to date leaves no room for equivocation on that point. The Defendant assigns that the stop constituted a full-blown personal detention and not merely a brief 'stop and inquiry.' The Defendant further says that the stop and its ensuing circumstances had no foothold whatever in probable cause.

But even if the Government were to characterize the curtailment of the Defendant's liberty as a Terry[5]-type engagement, there exist no 'articulable facts' in the *scenario* which would have justified it.

> In a *Terry*-type investigatory stop, 'the officer's action [must be] justified at its inception, and ... reasonably related in scope to the circumstances which justified the interference in the first place.' [Citation omitted.] In applying *Terry*, the Court has several times indicated that the limitation on 'scope' is not confined to the duration of the seizure; it also encompasses the manner in which the seizure is conducted. See, *e.g., Hiibel v. Sixth Judicial District Court of Nevada, Humboldt County, 542 U.S. 177, 188, 124 S. Ct. 2451 (2004)* (an officer's request that an individual identify himself 'has an immediate relation to the purpose, rationale, and practical demands of a *Terry*

[5] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868 (1968).

> stop'); *United States v, Hensley*, 469 U.S. 221, 235, 105 S.Ct. 675 (1985) (examining, under *Terry*, *420 both "the length and intrusiveness of the stop and detention"); *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319 (1983) (plurality opinion) ('[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop [and] the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion ....').
>
> * * * *
>
> 'A routine traffic stop,' the Court has observed, 'is a relatively brief encounter and "is more analogous to a so-called *Terry* stop ... than to a formal arrest." ' *Knowles v. Iowa*, 525 U.S. 113, 117, 119 S.Ct. 484 (1998) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.C t. 3138 (1984)); see also *ante,* at 841 (SOUTER, J., dissenting) (*The government may not 'take advantage of a suspect's immobility to search for evidence unrelated to the reason for the detention*.').

Caballes, *supra*, at 543 U.S. 419-429, L.Ed. citations omitted, emphasis supplied.

So, there must be a constitutional rationale for a law enforcement Officer to conduct a Terry stop at the *very beginning* of the inquiry, and once the reason for the initial inquiry for the stop has been satisfied, an Officer cannot exceed his or her charter under Terry by expanding the scope of the intrusion.

> 'A seizure ... can become unlawful if it is prolonged beyond the time reasonably required to complete [the initial] mission.' *Terry*, it merits repetition, instructs that any investigation must be 'reasonably related in *scope* to the circumstances which justified the interference in the first place.' 392 U.S. at 20, 88 S.C t. 1868 (emphasis added). The unwarranted and nonconsensual expansion of the seizure here from a routine traffic stop to a drug investigation broadened the scope of the investigation in a manner that, in my judgment, runs afoul of the Fourth Amendment.

Cabelles, at 125 S. Ct.844-845

But where there is no justification for a Terry-type inquiry to begin with, the totality of the Police conduct in conducting a stop – regardless of hunch, suspicion or unreliable intelligence – is constitutionally mortal and any matter seized as the result of that conduct, whether direct or derivative,[6] must by excluded.

In the instant case, there is simply no affirmative rationale for the stop of the Defendant's car. But perhaps of more moment is that which is not contained in the facts precedent to the stop:

-- There is no evidence of information assistance of any informer, whether Aguilar / Spinelli[7] – qualified or otherwise;

-- There is no evidence that the Defendant was operating his car erratically or in any manner other than that lawfully expected of those driving on the roadways of the State of Rhode Island;

-- There is no evidence of any equipment failure or violation on the part of the Defendant which may have drawn the attention of the Troopers to his vehicle;

-- There is no evidence that the Troopers had any knowledge that the Defendant had committed, was committing or was about to commit a transgression of the laws of the State of Rhode Island or those of the United States;

-- There is no evidence that the Defendant's vehicle was other than duly registered or that his license was other than duly issued and valid;

---

[6] Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407 (1963).

[7] Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509 (1964); Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584 (1969). The Defendant understands that this two-pronged test is no longer an essential prerequisite to the *Federal* validity of a 'snitch's' intelligence. Notwithstanding, such qualifications are still frequently used to add 'color' to an informer's pedigree.

-- There is no evidence that the Defendant had – or was suspected of having – a record or history of criminal activity;

-- There is no evidence of any statement or statements on the part of the Defendant which admitted of any wrongdoing on his part, or which have raised any suspicion – founded in fact -- in the minds of any law enforcement Officer of any such wrongdoing; and

-- There was no knowledge on the part of any law enforcement Officer that the Defendant was connected – even by mere association – with any conspiracy to violate the laws of the State of Rhode Island, the United States or, for that matter, the laws of any other jurisdiction.

The above list is representative, not comprehensive. That is, it is not self-delimiting or inclusive.

It is clear that the stop of the Defendant's car was conducted in the absence of probable cause and that therefore any evidence taken as a consequence of it is constitutionally tainted and must be suppressed as against the Defendant in this or any other proceeding.

**2. <u>The Defendant was Effectively under Arrest after the Vehicle Stop</u>.**

After the Defendant and his vehicle were detained, both somehow found their way to a Rhode Island State Police Barracks in the company not only of State Police, but ICE Agents as well. Which is to say that the Defendant and his vehicle were caused – by law enforcement Officers – to be transported to the Barracks. In this, the Police conduct was – *a priori* – an arrest of the Defendant and a seizure of his car and its contents.[8] Although the Officers involved may have informed the Defendant that he was 'free to go'

[8] The 'consent' issue is taken up below.

at some point *after* all concerned had arrived at the Barracks, such a recitation did not absolve the nature of the original curtailment of the Defendant's freedom as an arrest.

The stop took place under circumstances which would be virtually impossible to characterize as other than an arrest. The Defendant was pulled over by members of the Rhode Island State Police – and possibly other law enforcement agents – who were armed and who in fact detained the Defendant. At the point of the original confrontation, none of the Officers indicated that the Defendant was free to go on his way, none of the Officers informed him that he was *not* under arrest. Confronted with an imposing Police presence, the Defendant would necessarily have formed the belief that he was, in fact in Police custody, and that he was not free to continue on his way. See Commonwealth v. Tart, 408 Mass. 249, 557 N.E.2d 1123 (1990). He was certainly not at liberty at that point, nor did any of the Officers on the scene indicate to him that he was free to go. The question here is whether a reasonable person would conclude, based upon the Officer's statements and acts, that he or she was not free to leave. Commonwealth v. Bryant, 390 Mass. 729, 459 N.E.2d 792, 799, ft. 11 (1984), referencing Lowe v. United States, 407 F.2d 1391, 1397 (9th Cir. 1969) and United States v. Booth, 669 F.2d 1231, 1235 (9th Cir. 1981). Or to put it another way, "...how [would] a reasonable person in the [defendant's] position...have understood his situation[?]" Commonwealth v. Shine, 398 Mass. 641, 647-648, 500 N.E.2d 1299 (1986), citing Berkemer v. McCarty, 468 U.S. 420, 442, 104 S.Ct.3138 (1984). Bryant, *supra*, suggests that an element to be considered in asking this question is whether or not the confrontation terminated in an arrest (*Id.*, at 459 N.E.2d 798). An arrest *was* effected in this case, achieved at the moment the Officers appeared

in full force. But prior to that time, there was no tangible evidence, *in fact*, that the Defendant had transgressed the law.

A detention is an arrest where, "*...at the moment of [detention]*, the facts and circumstances known to the police officer [must have been] sufficient to warrant a person of reasonable caution in believing that the defendant had committed or was committing a crime." Commonwealth v. Gullick, 386 Mass. 278, 283, 435 N.E.2d 348 (1982), emphasis supplied. But the present Police action exceeded the definition of a Terry stop, or any 'initial inquiry.' This was a *seizure*. "A seizure occurs under the Fourth Amendment and art. 14 whenever a motor vehicle is stopped by an agent of government." Commonwealth v. Rodriguez, 430 Mass. 577, 579, 722 N.E.2d 429 (2000).

> A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, " 'by means of physical force or show of authority,' " terminates or restrains his freedom of movement, *Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382 (1991) (quoting *Terry v. Ohio*, 392 U.S. 1, 19, n. 16, 88 S. Ct. 1868 (1968).

Brendlin, *supra*, at 127 S. C t. 2405.

> We resolve this question by asking whether a reasonable person in Brendlin's position when the car stopped would have believed himself free to "terminate the encounter" between the police and himself. *Bostick, supra*, at 436, 111 S. Ct. 2382. We think that in these circumstances any reasonable passenger would have understood the police officers to be exercising control to the point that no one in the car was free to depart without police permission.

Brendlin, at 127 S.Ct. 2406-2407.

The Defendant was most certainly in Police custody from the time of the original confrontation and detainment at least until some while after he had been held at the Barracks. Of importance to the arrest – although there were later claims that the

Defendant was administered his Miranda *caveats* – he was not advised of any such prophylaxes prior to his alleged 'consent' that the presiding Officers be at liberty to search through the large duffel bag in the back seat of the car.

**3. The Defendant's 'Consent' to the Duffel Search was not Valid.**

A recognized exception to the Warrant Clause is the 'consent' of one whose privacy is at stake, but nonetheless agrees that a law enforcement officer may invade his or her premises or effects. Schneckloth v. Bustamonte, 412 U.S. 218, 222, 93 S.Ct. 2401 (1973). In such a case, since it is the Government which will be claiming the exception, it is the Government's "...burden of proving that the consent was, in fact, freely and voluntarily given." Bumper v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788 (1968).

In Bumper, the searching Officer obtained 'consent' by falsely claiming that he possessed a warrant permitting his intrusion. The Bumper Court ordered the fruits of the search excluded because the consent was not valid. The consent was not constitutionally[9] valid because it was not "freely and voluntarily given." The Bumper Court's decision relied upon the wisdom of the District of Massachusetts. At 391 U.S. 548-549, it cites to United States v. Elliott, 210 F.Supp. 357, 360 (D. Mass. 1962), in which the Court observed that

> [o]rderly submission to law-enforcement officers who, in effect, represented to the defendant that they had the authority...to search..., was not such consent as constituted an understanding, intentional and voluntary waiver by the defendant of his fundamental rights under the Fourth Amendment to the Constitution.

[9] The Defendant understands that the exceptions to the Warrant Clause are creations of the Judiciary.

*Id*. "The district court's conclusion as to whether consent was freely given must take into account the totality of the circumstances surrounding the interaction between the defendant and the authorities." United States v. Perez-Montanez, 202 F.3d 434, 438 (1st Cir. 2000). "This interaction, in turn, is measured by a standard of 'objective reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?'" United States v. Weidul, 227 F.Supp.2d 161, 166-167 (D. Mass.2002), quoting from United States v. Turner, 169 F.3d 84, 87 (1st Cir. 1999).

Moreover, a subject's "possible subjective state" is a factor in determining whether his or her apparent 'consent' was an intelligent and voluntary relinquishment of a right. See, for example, Schneckloth, *supra*, at 412 U.S.227. That a subject was simply "going along to get along" does not establish consent -- "...acquiescence [is] not probative of consent." United States v. Berryman, 717 F.2d 651, 655 (1st Cir. 1983), citing to Bumper at 341 U.S. 548-549.

In United States v. Tibbs, 49 F.Supp.2d 47 (D. Mass. 1999), which also involved a search by alleged agreement in which the validity of the consent was challenged, the Court put something of a fine point on this exception to the Warrant Clause. The accession to search in the Tibbs case was obtained by verbal coercion, but the Court was clear on the restrictions imposed by Bumper:

> When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. If that is false, *whether or not the officers could have procured a warrant*, consent procured as a result is vitiated.

At 49 F.Supp.2d 54, ft. 16, emphasis added. The Court went on to observe that although the officers did not claim to have actually *had* a warrant, they did represent that the

ensuing intrusion was inescapable, one way or the other. The Court was of a mind that this was not so. The inference to be drawn from the Tibbs language is that if a convincing bluff is run on an occupant by an officer intent upon a search, any resultant leave to conduct a search does not fall within the consent exception to the Warrant Clause.

Lo-Ji Sales, Inc. v. State of New York, 442 U.S. 319, 99 S.Ct. 2319 (1979) presents facts with a slightly different – but nonetheless helpful – twist. There, the defendant ran a store which was in the business of selling books, films and other articles. Local Police, believing the defendant maintained in his inventory pornographic works for sale, obtained a warrant to search the store. But the warrant was "open-ended," the generic equivalent of the long ago banished 'writ of assistance.' Hence, the Court found the 'warrant' infirm. The present case is somewhat similar. The Lo-Ji Court said, "After Lo-Ji's agent was placed under arrest and was aware of the presumed authority of the search warrant, his conduct complying with official requests cannot, on this record, be considered." At 442 U.S. 329.

In the present case, there can be no real dispute that the Defendant was in Police custody from the time his vehicle was stopped and detained until at some later point he was released. During that period, however, the Defendant's state of mind was such that not only did he believe he was under a state of arrest, but also that he had no effective right to refuse consent for the Officers to search the bag. Certainly, he was not advised that he had such a right – which, of course, he did. And suspicious Officers intent on discovering the content of a container in a vehicle are not very likely to explain to a subject that he or she is possessed of the authority to frustrate such intent.

In any event, under the circumstances, it is highly unlikely that the Defendant believed other than that the Officers were lawfully entitled to examine the contents of the bag. If the Officers did, in fact, ask the Defendant for permission, he would have understood the request to be a mere – and irresistible – formality. Akin, perhaps, to a person's seeking

leave to sneeze by saying 'Excuse me." A person unfamiliar with his or her constitutional protections, and who is not 'street smart,' simply does not resist the entreaties – or directives – of a group of armed peace officers. The outcome of the 'consent' request was just a foregone conclusion. Since the choice to agree or disagree to the search was entirely empty of authority, it had no significance at all. The Defendant's 'consent' was nothing more than surrender to the inevitable. This is exactly what is meant by the words "mere acquiescence" in Bumper.

**4. 'Fruit of the Poisonous Tree.'**

Since the evidence taken against the Defendant – including his statements – was all subject to the prior taint of the unlawful stop, it must all be excluded as against the Defendant under the doctrine of Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407 (1963).

**5. Conclusion.**

For the reasons cited herein, for those which may be adduced at hearing, and for those reasons which this Court may find in the interests of justice, the Court is asked to suppress all evidence in this matter, whether tangible or intangible, and whether direct or derivative, in this or in any other proceeding.

***HEARING ON THE UNDERLYING MOTION IS HEREBY REQUESTED***

Respectfully submitted,
CHARLIE VU, Defendant,
By his Counsel:

'/s/Walter H. Underhill, Esquire'

Walter H. Underhill, Esquire
66 Long Wharf, 4th Floor
Boston, Massachusetts 02110
Tel (617) 523-5858
Massachusetts BBO #506300

*/s/ William C. Dimitri*
William C. Dimitri, Esq.
462 Broadway
Providence, RI 02909

DATED: February 13, 2008

CERTIFICATION

I hereby certify that a true copy of this memorandum was served via electronic means, upon Mary Rogers, A.U.S.A. on this the 13th day of February 2008.

*/s/ William C. Dimitri*