UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA )
)
v. ) NO. 07-CR-136-ML
)
CHARLIE VU )

**DEFENDANT'S SENTENCING MEMORANDUM**

Charlie Vu ("the Defendant"), in the above-numbered Indictment and through Counsel, submits the following Memorandum for this Court's consideration prior to his sentencing:

**Facts.**

**1. The Offense Conduct.**

On May 11, 2007, the Defendant began driving north on Interstate 95 from his home in the State of New Jersey. Contemporaneously, a mobile surveillance of the Defendant was begun by Immigrations and Customs Enforcement ("ICE").[1] With no apparent deviation from course, the Defendant drove to a parking lot in South Kingston, Rhode Island, where he stopped, used his cell phone, and then travelled to a second parking lot, where he met an Asian male. The two got out of their vehicles and entered a restaurant, where they remained for approximately half an hour.

Having left the restaurant, the unidentified male took a duffle bag from his truck and handed it to the Defendant, who put it into his own car. The Defendant then started his car and began to head southward.

In Richmond, Rhode Island, the Defendant was stopped by Rhode Island State Police. A consent search of the car was made by the Troopers. The duffel bag --

[1] Their interest in the Defendant was not unfounded.

containing over $200,000 – was seized on the spot and the Defendant's vehicle towed. The Defendant himself was brought to the Hope Valley State Police Barracks for questioning.

Somewhere in the same time vicinity, the duffel bag was subjected to canine scrutiny. The dog 'alerted' to the presence of drugs and the bag was opened. A search of the duffel did not reveal any drugs, but a considerable amount of U.S. currency.

Upon interrogation by ICE Agents,[2] the Defendant proved to be quite docile and straightforward, demonstrating no attempt at guile or evasion. He freely admitted he had been 'commissioned' to make the trip and bring the bag back to New Jersey, noting that he *was* to be paid $1,000 for his efforts. He said to the Troopers that it seemed like 'easy money.'

The interview was concluded at 3:15 p.m. The Defendant was then given his liberty and he drove away from the Barracks in his own vehicle. The authorities, of course, retained the duffel and its contents.

**2. <u>The Indictment</u>.**

As a consequence of his behavior, the Defendant was indicted by a Grand Jury of this District on October 24, 2007 on a single count of money laundering in violation of 18 U.S.C. §1956(a)(1)(A)(1).[3] The Defendant was arrested in New Jersey the following day. He was detained until October 26, 2007, at which point a further detention hearing was held before the Magistrate Judge, who released him on a $250,000 unsecured bond.

---

[2] It is not completely clear exactly who conducted the interview and whether or not any Rhode Island Trooper participated.

[3] Although this section provides a maximum penalty of twenty years' incarceration, it carries no minimum mandatory sentencing clause.

On November 1, 2007, the Defendant was presented to a different Magistrate Judge for arraignment. The Court ordered bail set at $250,000, with conditions, but that it be secured. The Defendant, through the help of two of his brothers, successfully posted the required sureties.

The Defendant has been at liberty throughout and, "[a]ccording to the Pretrial Services Unit of the Court, the Defendant has complied with all of his release conditions." [See, Paragraph 4 of the Confidential Presentence Investigation Report, emphasis added.]

**3. The Change of Plea.**

On April 30, 2008, the Defendant offered a successful change of plea to the one-count Indictment. There was no prior plea agreement struck between the Defendant and the Government.

Sentencing has been set for August 19, 2008.

**4. The Defendant -- Personal History and Characteristics.**

The Vu family originated in Viet Nam. The Defendant was born in 1962 and accrued – ultimately – nine siblings, all from the same parents, Hung Vu and The Vu, ages 80 and 74 respectively. The family surely suffered the collateral effects of the Viet Nam conflict during the late 1960s through 1975. After 1975, the family was beset by different sets of problems owing to the new system of government. Nonetheless, they maintained a close bond among one another and were able to make do.

The Defendant became a naturalized citizen of the United States in 1988. With the exception of the Defendant's Mother and three of his brothers, the rest of his family have become naturalized United States citizens. His entire family, save one brother who

has remained in Viet Nam, lives in the United States. Although his parents do not – or cannot – work, his siblings have children and good jobs. They are conscientious and responsible members of their respective communities. As to the brother who still lives in Viet Nam, Cuong Vu, he is married with two children and is employed as a pharmacist.

Formerly married, the Defendant has voluntarily provided $400 a month for the support of his only child, a daughter named Tiffany. He enjoys a loving relationship with Tiffany and stays in regular and frequent contact with her. In the last three years the Defendant has lived with Ms. Linh Bui in New Jersey. She has two children who are emancipated – at least by age – and with whom the Defendant has had a close and respectful relationship. Ms. Bui's loyalty and concern for the Defendant is self-evident: she drove with the Defendant to the presentence interview, corroborated the details of his interview, submitted to an interview herself, and – although she knows that he will be subject to sanction for his conduct -- has high hopes that he may be returned to her as soon as the law can permit.

Mr. Vu is a graduate from a high school in New York, attended the New York Maritime Academy and earned a bachelor's degree in electrical engineering. He also was employed as a merchant marine for the United States Coast Guard for a time. Although the Probation Service has yet to hear from the Maritime Academy, there are several indicators that he speaks the truth. Among them are:

-- His cooperation and honesty with ICE and the Rhode Island State Troopers immediately following his arrest;

-- That he has honored – without incident – the conditions of his liberty pending sentencing;

-- His financial statement was independently corroborated; and

-- That his tax records were confirmed by the Internal Revenue Service.

The Defendant has been regularly and honestly employed during his twenty-year tenure in this country. He is neither an alcohol nor substance abuser. Although he admitted the one-time use of cocaine, this is not a problematic issue with him.[4]

**5. <u>The Probation Officer's Sentencing Calculus</u>.**

According to the Guidelines, the Probation Service has accurately calculated the mathematics. The matter of money laundering calls for a base offense level of 8, plus an accounting for the quantity of money involved. In this case, since the bag contained between $200,000 and $400,000, Guidelines §2B1.1(b)(1)(G) adds 12 more points, elevating the offense level to 20. Additionally, under two other discrete sections of §2S1.1, the offense level was factored upward by 6 points and 2 points, totalling overall an Adjusted Offense Level of 28 points. Probation then subtracted a full three levels for Acceptance of Responsibility for a Total Offense Level of 25.

The Defendant's criminal history score was 0, hence his Criminal History Category was I. The Guidelines sentencing range here is 57-71 months.

Not surprisingly, the Defendant will ask this Court to find that this sentencing range, *for him*, is unfairly grave and that a variant sentence undercutting the range is appropriate, given all the circumstances of this case.

**<u>Argument</u>.**

**1. <u>Post-*Booker* Sentencing</u>.**

Two years ago, the First Circuit decided <u>United States</u> v. <u>Jimenez-Beltre</u>, 440

[4] At the time of this admission, he tested positive for cocaine. Aside from that, all his urine screen have come back negative for any kind of proscribed substance.

F.3d 514 (1st Cir. 2006), establishing a sentencing protocol "as clearly as can be possible" in the aftermath of United States v. Booker, 543 U.S. 220, 125 S.Ct. 738 (2005).

The beginning of the Court's opinion makes it unambiguous that "reasonableness" was then the new touchstone of post-Booker sentencing.[5] Hand-in-glove with that precept, the Jimenez-Beltre Court found the United States Sentencing Guidelines were not "presumptively controlling," and that a Guidelines sentence was *not* "per se reasonable." 440 F.3d 518. Although the Guidelines are not simply "another factor" in the process of disposition, "[they] are still *generalizations*." *Id*., emphasis in original.

"*Booker's* remedial solution makes it possible for courts to impose non-guideline sentences that override the guidelines, subject only to the ultimate requirement of reasonableness." *Id*.

The holding in Booker has permitted the statutory sentencing mandates of 18 U.S.C. §3553 to accorded new vitality and prominence where they were, pre-Booker, effectively trumped, or at least neutralized. Indeed, in his concurring Opinion, Judge Torruella states unequivocally:

> Finally, I think it is of *critical importance* that the majority opinion be understood to reinforce our commitment to the statutory requirement that, *in all cases*, district courts must impose sentences that are '*sufficient, but not greater than necessary*' to effectuate the goals of criminal punishment, as articulated in 18 U.S.C. § 3553(a). In articulating its reasons for imposing any sentence, the district court must make clear reference to this *central principle*.

*Id*., at 440 F.3d 521, emphasis supplied.

5 ?[S]entences would be reviewable for reasonableness whether they fell within or without the guidelines.? Jimenez-Beltre, at 440 F.3d 517.

In *his* Concurring Opinion, Judge Howard put an even finer point on it:

> The so-called 'parsimony' provision, which requires that sentences be only as long as necessary to serve the purposes listed in section 3553(a)(2), has received scant attention from courts. Commentators note that this provision 'is not just another factor' to be considered along with others set forth in Section 3553(a)' -- *it sets an independent limit on the sentence a court may impose*.

*Id*., at 440 F.3d 526, citations omitted, emphasis added. Judge Howard also observed that the "parsimony" provision is the lead-off language in §3553. It is a charter clause, governing those sentencing provisions which follow it.

Subsequent to Jimenez-Beltre, the Booker decision – as radical as it was at the time – has undergone further and progressive refinement which has conferred upon the Courts substantially greater defensible sentencing discretion than a pro-Booker advocate would ever have thought possible. [The Booker Court held, to put it simplistically, that the Guidelines were no longer mandatory but that the Courts were obligated to implement them as 'advisory,' a benchmark from which to begin fashioning the fate of a defendant. This Court might take judicial notice that after Booker, many Judges felt free to grossly exceed the Sentencing Guidelines while others have often sentenced below the Guidelines to a noticeable degree. Others simply took the 'safe' ground, adhering to the Guidelines. The Circuit Courts – measuring a defendant's sentencing destiny by the elusive and abstract 'reasonableness' standard of review -- were very busy indeed.]

In 2007, the Supreme Court broadly expanded the discretion of sentencing Courts in Rita v. United States, 551 U.S. ---, 127 S.Ct. 2456 (2007), Kimbrough v. United States, 552 U.S. ---, 128 S.Ct. 558 (2007) and Gall v. United States, 552 U.S. ---, 128 S.Ct. 586

(2007).[6]

In Rita, the Court took a modest step away from Jimenez-Beltre: "If the sentence reflects a proper application of the Guidelines, the appellate court may, but is not required to, apply a presumption of reasonableness [to the trial Court's findings]." At 127 S.Ct. 2463. In Gall,[7] that step became a near-*quantum* leap. To be sure, an appellate panel was not barred from examining a sentence not consonant with the Guidelines, but it nonetheless "...*must* give due deference to the district court's decision that the §3553(a) factors, *on a whole*, justify the extent of the variance."[8] [At 128 S.C t. 597, emphasis added.] The Gall Court also 'clarified' its intent in Booker – a sentencing Judge was now required to observe the broadest spectrum of the circumstances of a given case. He or she could no longer hand down a sentence deliberately or specially weighted in favor of the Guidelines. 18 U.S.C. §3553 was now recognized as invested with authority arguably more prominent than that of the Guidelines in the matter of sentencing.

Kimbrough, with a wider-angle lens, took an even more macroscopic view of Federal sentencing, conferring upon the Courts greater – but more importantly, clearer – discretion over a defendant's post-disposition future.[9] The Kimbrough Court did not equivocate:

> ...the district judge should then consider all the §3553(a)

---

6 The keepers of the Guidelines themselves candidly admitted – and changed – certain inequities within the Guidelines construct. Eminent among these was the 'crack cocaine' Amendment.

7 Gall effectively adopted the more defendant-cordial thrust of Justice Lipez' Dissent in Jimenez-Beltre, essentially, if not expressly, stripping Jimenez-Beltre of its chevrons of command. A defendant was no longer compelled to present 'extraordinary circumstances' in order to be eligible for an out-of-Guidelines-range sentence.

8 'Variant' sentencing – a phenomenon different from departure sentencing – has become a virtual, perhaps actual – word or phrase of art.

9 Gall and Kimbrough both appear to be Booker-explanatory, as though their express and implicit principles evolved from, and were intended by, the Booker Court's revolutionary Opinion. Booker might metaphorically resemble a new statute while Gall and Kimbrough may be likened to explicatory regulations.

> factors to determine whether they support the sentence requested by a party. *In so doing, he may not presume the Guidelines range is reasonable*. He must make an individualized assessment based on the facts presented. If he decides that an outside Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.

At 128 S.Ct. 596-597, emphasis added.

But this language from Kimbrough cannot be misconstrued to be understood as a complex standard of review. It simply creates a kind of 'procedural checklist,' so that a sentencing Court would observe proper protocols. While the new standard of review may still implicate the question of 'reasonableness,' it is applied with substantially more generosity to the integrity of a trial Court's findings, as well as its sentencing Order, whatever it may be.[10]

Moreover – brewed from the yeast of Booker, and of profound significance to the post-Booker landscape, a sentencing Court is now free to take a hard look at Guidelines 'policy,' disagree with at, and deviate from it:

> The Government acknowledges that the Guidelines 'are now advisory' and that, as a general matter, 'courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines.' Brief for United States 16; cf. *Rita v. United States*, 551 U.S. ___, ___, 127 S.Ct.2456 (2007) (a district court may consider arguments that 'the Guidelines sentence itself fails properly to reflect §3553(a) considerations').

Kimbrough, at 128 S.Ct. 570, L.Ed. citation omitted. This specific addition to the discretion of a sentencing Court is hardly insignificant. In fact, it goes to the very spine of the United States Constitution – the division of powers doctrine. For twenty years a

---

[10] The 'due deference' standard may permit a 'lenient' sentence to stand. But it also would seem to give more protection to the sentence of a Judge who has treated a defendant with severity.

specifically judicial function, historically honored for about two hundred years, has been hamstrung by a scheme perhaps honorable in the abstract but disastrous in the execution.[11]

Treatment of a defendant as an *individual,* under §3553,[12] has acquired a tenacious effect on the sentencing process through the wisdom of the Courts. Booker held by a five over four vote. Gall and Kimbrough were both decided by seven to two votes.[13]

The First Circuit has made worthy – and notable – comment in the wake of these decisions. United States v. Martin, 520 F.3d 87 (1st Cir. 2008) is a good example. In one of several references to Gall, the Court said: "...the Justices emphasized the broad sweep of a sentencing court's discretion... " At 520 F.3d 90. While the Court

> "...acknowledged that the Guidelines deserve some weight in the sentencing calculus, * * * [Gall] made clear...that courts of appeals must grant district courts *wide latitude* in making individualized sentencing determinations, thus guarding against the institutionalization of an *impermissible presumption that outside-the-range sentences are unreasonable*.

At 520 F.3d 91, emphasis supplied, citations omitted. The Martin Court also recognized that "...a sentencing court possess the raw power to deviate from the Guidelines... ." *Id.*[14] And, recognizing that a justification may be needed for a variant sentence, the Court said:

> We hasten to add, however, that notwithstanding this need

11 Seven years after their promulgation, none other than Judge Young, former Chief of the Massachusetts District, stated without reservation that "...the Sentencing Guidelines are a complete failure." United States v. Angiulo, 852 F.Supp. 54, 59 (D. Mass. 1994).

12 Older than its 'cousin' Guidelines.

13 The show of cohesiveness among the Justices in the Gall and Kimbrough majorities is – to Counsel – astonishing in light of the probability that Booker was one of the most fractious decisions in Supreme Court history.

14 In balance, the Court also suggested that a sentencing Court cannot do so upon a meretricious premise.

> for an increased degree of justification commensurate with an increased degree of variance, there is no stringent mathematical formula that cabins the exercise of the sentencing court's discretion. Indeed, after *Gall* the sentencing inquiry – once the court has duly calculated the GSR – ideally is broad, open-ended, and *significantly discretionary*. United States v. Vega-Santiago, 519 F.3d 14, 20 (1st Cir. 2008) (en banc). At that point, sentencing becomes a judgment call, and a variant sentence may be constructed 'based on a complex of factors whose interplay and precise weight cannot even be precisely described.' *Id*., at 19.

*Id*., at 520 F.3d 91-92, emphasis added. That is, although a Circuit may review a sentence for 'reasonableness' in a 'due deference' capacity, the Circuit Court cannot possibly grasp all the intangibles before the sentencing Court and cannot therefore easily and dismissively pigeonhole a disposition Order. The Circuit Court is simply unable, under any circumstance, to fit the shoes of the tribunal where all the action occurred, where it was the District Court's most difficult task to sift through an extensive mix of law, facts, demeanor, attitudes, credibility, and personal characteristics wholly different from those of any other defendant. The Circuit Court *was not present*, and no record is sufficient enough to give that Court the full flavor of the sentencing proceeding or to inform it of the many intuitive routes the sentencing Court must travel before it reaches a considered conclusion. In this vein, the Martin Court continued, stressing two 'abecedarian' principles:

> First, because we cannot desultorily substitute our judgment for that of the sentencing court, it is not a basis for reversal that we, if sitting as a court of first instance, would have sentenced the defendant differently. Second, reasonableness is a protean concept, not an absolute. *We think it follows that there is not a single reasonable sentence but, rather, a range of reasonable sentences*. Consequently, reversal will only result if – *and only if* -- the sentencing court's ultimate determination falls outside the

expansive boundaries of that universe.

*Id*., at 520 F.3d 92, emphasis supplied, citations omitted.

This is a significant utterance, particularly for a forum which – not so long ago – would not rise over the watermark set by Jimenez-Beltre.

Finally, the Martin Opinion underscored a sentencing Court's authority to take issue with --- and vary from – Guidelines 'policy statements:' "...such policy statements normally are not decisive as to what may constitute a permissible ground for a variant sentence." *Id*., citing to United States v. Simmons, 479 F.3d 1115, 1130 (5th Cir. 2006); United States v. Rivera, 448 F.3d 82, 86 (1st Cir. 2006); United States v. Smith, 445 F.3d 1, 5 (1st Cir. 2006); and Kimbrough at 128 S.Ct. 570. This is congruent with this Circuit's attitude toward §3553(a). In United States v. Rodriguez, 527 F.3d 221, 229 (1st Cir. 2008), the Court adverted to the authority of a sentencing Judge to take an "...holistic review of the full panoply of section 3553(a) factors."[15]

### 2. Departure *versus* 'Variant' Sentencing.

The Defendant has retained the right to advocate a sentencing position of his own design. In having done so, he asserts that he is eligible for a downward departure or a variant sentence significantly lower than that of the strict Guidelines range calculated in the Presentence Investigation Report.[16]

He takes this position based on the considerations in §5K2.20 of the Guidelines, "Aberrant Behavior." The Defendant's circumstances represent a compelling model of

[15] As an example, the Court cited to Martin, *supra*, "...indicating that section 3553(6)'s instruction to consider 'unwarranted sentencing disparities' was not intended to encompass disparate coconspirator sentences but that such disparities nonetheless could be considered *under the totality* of the section 3553(a) sub-parts. Rodriguez, at 527 F.3d 229, emphasis added, parentheses omitted.

[16] In so saying, he by no means calls into question the quality of the work of the Probation Officer. It is self-evidently thorough and professional.

those contemplated by the Guidelines under this Section. The Court is respectfully asked to bear in mind that §5K2.20 is a 'Policy Statement,' so characterized by its own title, and also that there is no inherent limitation as to how far a Court may depart downward under the Section.

In order for the Court to do so, §5K2.20 requires a defendant with a clean record; that his or her offense conduct not embrace violence, the use of weapons, a serious drug offense or physical injury to another; that the offense conduct represent a single transaction; and that the offense conduct be a 'marked deviation from an otherwise law-abiding life.' The Defendant meets each of these criteria.

In considering whether a defendant's offense conduct was 'aberrant,' a Court should take into account the "...totality of the circumstances." United States v. Rivera-Rodriguez, 318 F.3d 268, 275 (1st Cir. 2003). Among the factors which may be considered under a 'totality of the circumstances' determination may include "pecuniary gain to the defendant," and "[s]pontaneity and thoughtlessness." *Id*. Also, a Court must "…evaluate *all* the data in order to determine whether this offense is a 'marked departure from the past and is unlikely to recur.' " United States v. Iaconetti, 59 F.Supp.2d 139, 144 (D. Mass. 1999), quoting from United States v. Bradstreet, 135 F.3d 46, 56 (1st Cir. 1998), emphasis supplied.

It is -- or ought to be – undisputed that the present Defendant's offense behavior consisted of only a *single* act, acceptance of control over the duffel bag by permitting it into his vehicle. There is no evidence that he ever looked into the bag.

From an 'holistic' view of the facts, an observer must conclude – close to a certainty -- that the offense of money laundering was not of the Defendant's origin or

design. He was simply acting as a deliveryman for people who stood to make considerable monetary gain. The Defendant's proposed pay for his efforts -- $1,000, a minute sum in the overall scheme -- was never received.

To put it another way, the Defendant was at a far remove from the echelons of power. He probably knew next to nothing about the individual with whom he dealt at the New Jersey end, and knew nothing at all of the man he briefly met in Rhode Island. By any rational reckoning, the Defendant's task in this enterprise was 'outsourced' to him and required no particular skills, abilities or knowledge of the nature and extent of the conduct on the part of the far more serious transgressors. The Defendant did not even know how much money was in the bag. In United States v. Garrison, --- F.Supp.2d ---, 2008 WL 2121784 (D. Mass. 2008), at *4, the Court spoke to the construct of an organized drug business: "[i]n many drug conspiracies...there is a strict hierarchy – the source, the packager, the wholesale distributor, the retail distributor." In its Sentencing Memorandum in United States v. Haynes, Docket No. 06-CR-10328-NG, June 3, 2008, at Page 10, the Court said: "Where the defendant falls in this type of hierarchy is an important factor in this Court's assessment of the defendant's ultimate culpability."

The present Defendant is sufficiently low on the scale that he does not fit into any category referenced in Garrison. Furthermore, it is almost certain the Defendant here was expendable in the sense that if he were caught it was simply a matter of profit and loss on someone's ledger. But because he knew nothing which could imperil any specific individual or organization, the risk ran solely to him. To be sure, people at both ends of the carrier's trip hope for success. A loss of the instant magnitude, however, is not likely to put the organizers out of business or into Federal custody.

The offense of money laundering is a serious crime with potentially harsh consequences for a defendant. It carries with it the implication that a person accused has occult responsibilities in clever schemes to commit a major crime or crimes and in turn legitimize the profits of the unlawful conduct. While this may in general be true, this Court is asked to assess the *relative* culpability of the present Defendant in fashioning his sentence.

The basis for that determination rests upon the most logical and fact-supported explanation of his background and the inferences that may be drawn from his offense conduct. In this case, the fair inferences to be drawn are comparatively simple. The Defendant was into his forty-sixth year at the time of the commission of his offense. Before that time he was crime-free.[17] Until this time, he has been a responsible citizen and family man. He has a loving relationship with his daughter, to whose comfort he regularly contributes; a cordial relationship with his former spouse; a loving and loyal relationship with his present partner who wholeheartedly supports his cause; and a close bond with her two children. His blood family's support and commitment to him are unquestionable. Two of his brothers – law-abiding citizens themselves – have made his pre-trial liberty possible by pledging not insignificant sureties in his behalf.

It is beyond argument that the Defendant's relative culpability was precipitously lower than those at either end of the transaction who stood to make the 'serious money' in the underlying scheme. He could never have hoped to gain a reasonable profit from the overall offense, never mind a position in its hierarchy. He was not a planner or originator of the scheme; he never placed any drugs into the community. In fact, while he may have had his suspicions about the work he was induced to perform, it was by no

[17] He has a criminal offense score of zero points and his Criminal History Category is I.

means clear to him that the conduct of others – after his task was complete – would ultimately lead to mass marketing of scheduled substances, or that the money he was asked to transport was the product of such sales. Even in light of his respectable education, he likely had no true conceptual grasp of the pernicious world into which he was drawn. What he *did* know was that he was induced to do *something* unlawful because he was probably in, or on the verge of, financial difficulty and $1,000 for a day's worth of his time seemed like 'easy money.'

This is not to say that the Defendant denies the gravity of his conduct, only that he was at the outer fringes of the considered, deliberate and profitable scheme of his employers, whoever they were, not in its midst.[18] As the Haynes Court (*supra*) said, "[t]he Sentencing Commission, for its part, has never explained exactly how drug quantity is meant to measure offense seriousness, and, significantly, how it correlates with the purposes of sentencing under 18 U.S.C. §3553(a)." At Page 9, citing to Paul J. Hofer & Mark H. Allenbaugh, *The Reason Behind the Rules: Finding and Using the Philosophy of the Federal Sentencing Guidelines,* 40 Am. Crim. L. Rev. 19, 71-72 (2003). Would the Defendant have been more criminally and socially responsible if he had created the scheme, profited by it or had been directly to blame for emptying large-scale drug quantities onto the street? *Infinitely*. But the Guidelines do not really take this into account, either by the letter or in terms of empiricism.

Another important question the Court may ask in terms of the Defendant as a candidate for a departure under §5K2.20 is whether he is a likely recidivist. While this is

[18] Although a 'minor participant' adjustment under §3B1.2(b) does not apply here, in the post-Booker landscape it is appropriate for a Court to consider whether a defendant is "...less culpable than most other persons convicted of comparable crimes." United States v. Martinez-Vargas, 321 F.3d 245, 250 (1st Cir. 2003). The Defendant says that he fits this characterization.

an issue which certainly cannot be scientifically resolved, virtually all the reasons he has highlighted in this Memorandum strongly suggest that he would not be a repeater. He admitted his part to the interviewing Agents just as soon as they spoke with him and, as the Presentence Investigation Report indicates, accepted responsibility without deliberation or delay. He has come to serious failure here, and has no doubt that this Court is likely to incarcerate him. He has no practice at a life of crime, and – since he has demonstrated no prior proclivity to it – would have no idea how to get started. Mostly, his record shows that he is a man who could not bear the thought of further and more catastrophic criminal conduct.

**3. The Defendant's Sentence.**

The Defendant is not certain what the Government will recommend at sentencing, although he is familiar with the Presentence Investigation Report and understands where he statistically fits within the Guidelines.

In having argued the considerations pertinent to Guidelines §5K2.20, the Defendant asks this Court to consider a downward departure from the Guidelines range or, in the alternative, a variant sentence for the same reasons. He asks for mercy. This Court is not unfamiliar with the fact that the pre-Booker Guidelines often exacted a penance far more severe than was truly warranted. In United States v. Isler, 429 F.3d 19, 25, 26 (1st Cir. 2005),[19] the Circuit stated:

> In both their sentencing proceedings, the district judge made a host of comments about her lack of discretion under the guidelines and the 'waste' brought about by the length and extreme harshness of the sentences. Moreover, the district judge stated that the sentence was 'tragic' because she was 'not sure that a sentence of this length is absolutely necessary' and that she was not sure that, in the absence of

[19] A post-Booker case reviewing this Court's pre-Booker sentence.

> the guidelines, she 'would have imposed that harsh a penalty.' In light of these remarks, which indicate a reasonable probability of lower sentences under advisory guidelines, Isler and Rashid are entitled to resentencing.

Albeit the conduct of Defendants Isler and Rashid was more serious than that of the present Defendant, and the Guidelines range far more severe, the rationale is here equally applicable. Under the provisions of 18 U.S.C. §3553, and taking into consideration the sentencing latitude and discretion this Court possesses under Gall and Kimbrough, this Honorable Court is asked to sentence Mr. Vu to a commitment no longer than one year and a day.

Respectfully submitted,

CHARLIE VU, Defendant,
By his Counsel:

'/s/Walter H. Underhill, Esquire'
WALTER H. UNDERHILL, Esquire
66 Long Wharf, 4th Floor
Boston, Massachusetts 02110
Telephone: (617) 523-5858
Facsimile: (617) 523-7834
Massachusetts BBO #506300; and

'/s/ William C. Dimitri, Esquire
WILLIAM C. DIMITRI, Esquire
462 Broadway
Providence, Rhode Island 02909
Telephone: (401) 273-9092
Facsimile: (401) 331-1898
Rhode Island Bar # 3129

DATED: August 8, 2008